HOUSTON OIL COMPANY OF TEXAS ET AL. V. D. L. GALLUP ET AL.

Decided March 26, April 23, 1908.

**1.—Grant—Patent to Heirs—Ancestor's Equitable Rights—Will.**

A special Act of the Legislature, February 1, 1850, directed the issuance of patent to the heirs of L. for a tract of land, "being the residue of a league to which said L. in her lifetime was entitled." L., a widow with children, who had emigrated to Texas, had, in 1834, procured an order for survey of a headright league from a colony commissioner, had survey, and received title to a part thereof, and survey elsewhere of the balance of the league, entering into possession, but receiving no title prior to the Revolution and closing of the Land Office. She died in 1843, leaving the untilled tract by will to certain of her descendants, and the special Act and patent to her heirs, in pursuance of it, was procured by her administrator on representation of the facts to the Legislature. Held, that the grant was not a mere gratuity to her heirs, but a recognition of existing rights in L., by virtue of the survey, which, though not constituting title, were capable of being devised by her will; and that the devisees took title on patent issuing, as against her heirs in general, to whom the land was patented.

**2.—Same—Cases Distinguished, etc.**

Lyne v. Sanford, 82 Texas, 61; Nona Mills Co. v. Wright, 101 Texas, 14, and other cases followed. McKinney v. Brown, 51 Texas, 96; Leonard v. Rives, 33 S. W., 292, and other cases distinguished.

**3.—Forced Heirship—Advancements.**

Facts considered, under which a will devising real property to certain of testator's heirs, her death occurring in 1843, was held not invalidated by the law of forced heirship then existing, the record showing previous gifts by deed, presumed to be advancements, to the heirs not provided for in the will.

**4.—Recovery of Land—Pleading—Judgment.**

A defendant in trespass to try title, who has settled with plaintiffs, and thereafter litigates his title as against the adverse claims of codefendants and interveners, is not entitled to judgment recovering from them the land to which he shows title, in the absence of pleading on his part seeking affirmative relief against them.

**5.—Assignment of Error.**

An appellant who assigned as error the rulings of law made the basis of the judgment against him, is held entitled to reversal, though his assignments of error had not complained of the adverse judgment rendered as a conclusion from such rulings.

Appeal from the District Court of Jefferson County. Tried below before Hon. L. B. Hightower.

The suit was trespass to try title brought by W. W. and R. Waterhouse against the Houston Oil Company, Gallup and Gordon. Hassell

and others intervened.   Plaintiffs sold to the Houston Oil Company and dismissed their action.   The litigation was continued between the defendants and interveners.

*Denman, Franklin & McGown, Taliaferro & Nall, Lanier & Martin,* and *G. P. Daugherty,* for appellants.—When Patsy Lewis died she was entitled to receive from the State of Texas, the land in controversy, and had taken the initial steps to secure the land and gone into possession of same.   She had not, however, secured patent for same, and it took a legislative act to provide for the issuance of patent.   The act introduced in evidence had for its purpose, not the granting of any land to the heirs of Patsy Lewis as a gratuity, but the real purpose of the act was to authorize the proper officers to issue the final evidence of the title of Patsy Lewis in the shape of a patent.   There is nothing in the record to show that the heirs of Patsy Lewis, as individuals, had any individual claim not deraigned from Patsy Lewis, to a grant from the State, and nothing in the record will show that it was the purpose of the State, by said special act above referred to, to make a naked gift to said heirs as individuals.   If the State had intended to make a donation of land, such intent would have been evidenced by a direct grant to such heirs as individuals and by name and not by an act conferring upon such heirs, as heirs of Patsy Lewis, the right to secure the final evidence of her rights to land to which she had become entitled prior to her death.   The form in which this final evidence should be put is not material as it necessarily inured to the benefit of the real owners of the right under Patsy Lewis.   Nona Mills Co. v. Wright, 101 Texas, 14; Ralston v. Skerrett, 82 Texas, 492; Hill v. Kerr, 78 Texas, 218; Lyne v. Sandford, 82 Texas, 58; State v. Zanco Heirs, 18 Texas Civ. App., 127; Massey v. Papin, 65 U. S., 362.

It appearing from the evidence that Patsey Lewis, by her will, had undertaken to dispose of the whole of her estate, and that the parties under whom intervenors and defendant Gordon claim, were beneficiaries under said will, and accepted the benefits therein, they are estopped from denying the title of the other beneficiaries under the will under whom appellants claim.   Phileo v. Holliday, 24 Texas, 38; Smith v. Butler, 85 Texas, 126; Pryor v. Pendleton, 92 Texas, 384; 2 Jarmon on Wills, 1; Sec. 464, Pomeroy's Equity Juris.

Some sixty-five years have elapsed since the death of Patsey Lewis and no claim has been asserted to the land in controversy adverse to the title held by appellants until the filing of the intervention herein. Neither the adverse claimants, nor those under whom they claim, have ever evidenced their claim by any assertion or acts of ownership.   Death has long since given final summons to those witnesses who might, if living, have told all the facts relating to the matters in controversy. Time has effaced proof that once was plain.   Patsey Lewis, by her will, disposed of all of her estate, including the land in controversy. The beneficiaries under the will have accepted thereunder.   They have acquiesced in the claim of those to whom the land in controversy was willed and asserted no title thereto.   From all the evidence it is reasonably probable that those under whom appellees claim have parted with any title they may have had, either by acquiescence, by partition, by

election or estoppel, or in some other way, and their conduct is best explained by such reasonable probability, and the lower court should have so held and rendered judgment for appellants. Fletcher v. Fuller, 120 U. S., 534; Fuller v. Fletcher, 44 Fed. Rep., 34; United States v. Devereaux, 90 Fed. Rep., 187; Texas Tram & Lumber Co. v. Gwin, 52 S. W. Rep., 110; Grayson v. Lofland, 21 Texas Civ. App., 503; Bringhurst v. Texas Company, 39 Texas Civ. App., 500; Arthur v. Ridge, 40 Texas Civ. App., 137; Daily v. Starr, 26 Texas, 562; Garner v. Lascar, 71 Texas, 435; McDow v. Rabb, 56 Texas, 158; Johnson v. Shaw, 41 Texas, 432; Johnson v. Timmons, 50 Texas, 531; Hooper v. Hall, 35 Texas, 87; Ballard v. Perry, 28 Texas, 366; Herndon v. Burnett, 21 Texas Civ. App., 21; Jones v. Reus, 5 Texas Civ. App., 628; Bounds v. Little, 75 Texas, 320; Ammon v. Dwyer, 78 Texas, 639; Manchaca v. Field, 62 Texas, 141; Baylor v. Tillebach, 20 Texas Civ. App., 490; Crain v. Huntington, 81 Texas, 614; Johnson v. Lyford, 9 Texas Civ. App., 85, 89; Smith v. Swan, 2 Texas Civ. App., 563; Harris v. Nations, 79 Texas, 411; Baldwin v. Roberts, 36 S. W., 789; Dunn v. Eton (Tenn.), 23 S. W. Rep., 163; Daniels v. Creekmore, 7 Texas Civ. App. 573.

*W. D. Gordon* and *Terry, Cavin & Mills,* for appellees.—At the death of Patsey Lewis in 1843, she had no title to the land in controversy assertable at law or in equity; and therefore no property rights therein the subject of sale or testamentary disposition. Board of Land Commissioners v. Reily, Dall., 381; Jones v. Menard, 1 Texas, 771; Jones v. Borden, 5 Texas, 409; Board of Land Commissioners v. Raguet, 2 Texas, 98; Paschal v. Perez, 7 Texas, 370.

Since neither Patsey Lewis at her death, nor her devisees thereafter, had established their claim to any land under any law under the provisions of which she might have acquired land; and since at the passage of the special act for the relief of the heirs of Patsey Lewis, there was no law extant under which they could acquire any land however meritorious their claim might be; the act of the Legislature in granting to the heirs the land in controversy in this suit was an act of sovereign grace and bounty—not in discharge of a legal obligation—and its benefits being expressly limited to the heirs, the judicial department can not, in violation of the terms of the act, divert these benefits from the persons named therein, to wit, the heirs of Patsey Lewis, to other and different persons, to wit, her devisees. McKinney v. Brown, 51 Texas, 94; Eastland v. Lester, 15 Texas, 102; Causici v. LaCoste, 20 Texas, 286; Ralston v. Skerrett, 82 Texas, 488; Todd v. Masterson, 61 Texas, 618; Leonard v. Rives, 33 S. W., 295; Grant v. Wallis, 60 Texas, 350; Rogers v. Kennard, 54 Texas, 34.

WILLSON, CHIEF JUSTICE.—The suit was to try the title to the Patsey Lewis survey of 17,639,400 square varas, situated in San Augustine County, on Ayish Bayou, and about twenty-one miles south of the town of San Augustine. Appellants, except as to a portion of the land for which they obtained judgment, claimed title through mesne conveyances from parties claiming as devisees under Patsey Lewis' will, and appellees claimed through mesne conveyances from parties claiming

as her heirs. From a finding of the court in favor of the title asserted by the heirs as against the title asserted by the devisees, and a judgment entered in accordance with such finding, and from a finding in favor of appellee D. L. Gallup against appellant S. W. Blount, who had warranted the title to a portion of the land, in the sum of $1427.40 as damages for a breach of the warranty, this appeal is prosecuted.

The trial court's conclusions of fact are a part of the record. So far as they do not conflict with the findings below, we think they are supported by the record. In one or two particulars we think they are not so supported; and in one or two other particulars where findings should have been made, none were made. These omissions have been supplied in the findings below.

Patsey Lewis, a widow with several children, emigrated to Texas from Missouri about 1818 and settled in San Augustine County. September 23, 1834, as the head of a family, she made application to the proper authority for a grant as a colonist to one league of land; and September 26, 1834, the proper commissioner directed that a survey be made for her of the quantity of land she had applied for. October 13, 1834, a survey—of twenty labors, it seems—was made for Mrs. Lewis by surveyor David Brown. The field notes of this survey were shown to be in the vault in the General Land Office where the Spanish archives are kept, and a copy thereof seems to have formed a part of the deposition of the witness Robison, but for some unaccountable reason same were not made a part of the record on this appeal. Therefore, we have been unable directly to determine whether the survey then made was of the land in controversy or not. Circumstantially, it perhaps sufficiently appears that it was. The circumstances connected with the filing of the field notes and the date of the filing thereof in the Land Office are not shown in the record. On a map compiled by David O. Warren, County Surveyor of San Augustine County, certified by Warren on November 10, 1839, as being correct, and forming a part of the archives of the General Land Office, the land in controversy was represented as the "Lewis" survey, as fronting west on Ayish Bayou, and as lying south of and adjoining the Leakey survey. On another map forming a part of said archives compiled in 1841 by Ira Ellis, then County Surveyor of San Augustine County, the land was represented about as it was on the Warren map.

July 23, 1835, a final title was extended to Patsey Lewis to a survey of 4,289,587 square varas, surveyed for her by authority of the order of the commissioner made on her application referred to. This land was shown to have been situated in said San Augustine County, about seven miles east of the town of San Augustine, and to have been the land on which she resided before and at the time of her death.

Patsey Lewis died in San Augustine County in 1843, leaving a will dated February 13, 1843, and probated June 19, 1843, by which she devised to her daughter Matilda C. Thompson 200 acres of the land in controversy, and to her sons Burrell J., George, and A. A. Lewis, the remainder thereof. November 12, 1849, Burrell J. Thompson, who had been appointed administrator with the will annexed of her estate,

as "administrator and representative of Patsey Lewis, deceased," peti-
tioned the Legislature to pass an Act requiring the Commissioner of
the General Land Office to issue a patent to the land in controversy,
according to the survey thereof made by David Brown in 1835.    In
his petition Thompson recites:

"Patsey Lewis, decd., during her life time and in and about the year
1834 or 5 obtained an order of survey for one league of land from the
Commissioner of Lorenzo de Zavala grant or colony as a colonist, viz.:
from George A. Nixon, and by virtue of said order of survey had a
portion of said land surveyed near San Augustine where she then
lived and afterwards died, and a title extended to the same by the afore-
said commissioner, George Antonio Nixon, in the year 1838—and your
petitioner also finds that she had the residue surveyed in the spring of
1835 about 20 miles south of San Augustine on the Ayish Bayou by
David Brown, one of the regular commissioned surveyors of said colony,
which is evidenced by and from the copy of the field notes herewith
appended to this petition, as also from the certificate of the County
Surveyor of San Augustine County that said survey for Patsey Lewis,
decd., has always appeared upon the map of said county, recognized
and acknowledged as her lands and has also been returned and appears
on the map sent to the General Land Office from this county."

February 1, 1850, "an Act for the relief of the heirs of Patsey Lewis,
deceased," became a law.    It was as follows:

"Section 1.    Be it enacted by the Legislature of the State of Texas,
That the Commissioner of the General Land Office be, and he is hereby
authorized and required to issue to the heirs of Patsey Lewis, deceased,
upon their paying the usual fees and Government dues, a patent for
thirty-five hundred and sixty-two acres of land, that being the residue
of a league to which said Patsey Lewis in her life time was entitled,
and that this Act take effect from its passage."

In accordance with said Act, on field notes of a survey of the land
made October 5, 1852, the land was patented to the heirs of Patsey
Lewis, deceased, August 3, 1853.

The inventory returned July 24, 1844, in the administration had on
Patsey Lewis' estate included as a part of the property belonging to
the estate "three-fourths of a league of land on Ayish bayou surveyed
and not titled."

At her death Patsey Lewis left as her heirs, Matilda Thompson, her
daughter; Ephraim Tally, child of her daughter Sarah Tally; Mar-
garet Johnson, her daughter; Mary Jones, her daughter; Precious
Blankenship, her daughter; Melinda Stovall, her daughter; and George
W. Lewis, Allison A. Lewis and Burrell J. Lewis, her sons.    During
her life time, at dates ranging from 1835 to 1841, she had executed
deeds of gifts whereby she had conveyed to each of her daughters,
except Matilda Thompson, to whom she devised 200 acres of the land
in controversy, 200 acres of the land she resided upon.    She had also
during her life time conveyed to her son Burrell J. Lewis a negro
boy named Willis, and to her daughter Sarah Tally a negro girl named
Jane.    By her will, on conditions named therein, she gave to her daughter
Matilda Thompson a negro woman named Polly, to B. J. Lewis a negro
woman named Sophia, and to Mary Jones a negro named Jane; and to

Presha Blankenship without condition a negro child. By the same will she devised to B. J. Lewis her "old field and what land she owned north of the old main road from San Augustine to Milam," which seems to have been a tract of forty acres out of her home place.

The inventory of her estate, before referred to, showed as belonging to same, in addition to the land in controversy, the following property only: negro slaves name "Polly," "Sofy," "Jane" and "Ellen;" forty acres of land; one old mare; and one cow and calf.

It was shown by a statement from the Comptroller's office, that in 1847 the taxes on 3321 acres of the Patsey Lewis survey were assessed against B. J. Lewis; that in 1848 the taxes on 3368 acres thereof were assessed against him "by B. J. Thompson, agent;" that in 1849 the taxes on 2241 acres thereof were assessed against him "by B. J. Thompson, agent;" and that in 1850 2214 acres thereof were assessed against him. It was also shown by the same statement that in 1849 the taxes on 1107 acres were assessed against Geo. W. Lewis, and that in 1850 the taxes on 1407 acres were assessed against him. It further appeared from said statement that in 1849, 1850 and other years, the taxes on a tract of 40 acres of the Patsey Lewis land were assessed against B. J. Lewis.

It appeared that during the life time of Patsey Lewis, at her instance, ten or fifteen acres of the land in controversy had been cleared. The clearing was referred to by a witness as "an old field." There is in the record no evidence of any further actual possession by any one of the land or of any part of it.

On facts found by him the learned trial court concluded as follows:

"At the time of the death of Patsey Lewis in 1843, she had no title whatsoever to the land in controversy in this suit, and it was not the subject of testamentary disposition by her.

"I conclude as a matter of law that the Special Act of the Legislature granting the land in controversy to the heirs of Patsey Lewis was an act of sovereign grace and bounty on the part of the State and that its benefits enured to all of the heirs of Patsey Lewis alike. And that therefore the title thus granted vested in all of the heirs of Patsey Lewis and their assigns."

In so concluding we think the trial court erred. As the head of a family, under the laws in force in 1834, Patsey Lewis was entitled to one league of land. As a part of the league to which she was entitled, by virtue of an order issued by the proper commissioner, the land in controversy was surveyed for her prior to the closing of the Land Office in 1835. The order for a survey then obtained was declared by the Constitution of the Republic to be valid. General Provisions, Sec. 10. The authority for the survey so made being valid, the survey made by virtue of that authority should be held to have been a valid survey, and to have operated as a segregation of the land in controversy from the public domain. To and in the land so segregated, Patsey Lewis had acquired a right—an equity—capable of being so perfected as to vest in her an absolute title to the land. Because of her failure to comply with requirements of laws then in force, such an absolute title did not vest in her, and she died owning only an equity

in the land. It was this equity which justified the action of the officers of the State in 1847, in 1848, in 1849 and in 1850, in assessing the land for taxes as property belonging to her legal representatives. It was this equity her administrator petitioned the Legislature to recognize and perfect by a patent to the land; and it was this equity, we think, that the Legislature in 1850 referred to when it declared that she was entitled to the land in her lifetime. As appears from its plain terms the Act of the Legislature was intended as a recognition of and as a provision for the enforcement of a right, and not as a donation.. And it was a right existing in Patsey Lewis and not in her heirs. As was said in Fishback v. Young, 19 Texas, 515, where a land certificate had been issued to the heirs of one Cornelius, "they —the children—have no personal or individual right to the land granted. They can claim only as the representatives of the deceased." And the court in that case added: "Let the grant be issued as it will, if the issue be to persons representing, in form or in fact, the deceased, it must inure to the benefit of all interested in the estate." And see Pendleton v. Shaw, 18 Texas Civ. App., 439; Soye v. Maverick, 18 Texas, 101; Lyne v. Sanford, 82 Texas, 61; Marks v. Hill, 46 Texas, 349; Hill v. Kerr, 78 Texas, 218; State v. Zanco's Heirs, 18 Texas Civ. App., 127; Rogers v. Kennard, 54 Texas, 35; Ralston v. Skerrett, 82 Texas, 492; Hines v. Thorn, 57 Texas, 102.

In disposing of the contention made in Lyne v. Sanford, supra, that a certificate issued to heirs was a donation to them and not assets of the decedent's estate, the court said: "By reference to the special Act, it will be seen that the Legislature, in granting this certificate, recognized that Willis A. Farris had before his death earned the right to a headright certificate of a league and labor, and in recognition of this right they granted to his heirs or legal representatives the certificate, if he had not theretofore received his headright. The terms of this Act clearly imply that the consideration that moved the Legislature to grant the certificate was the right existing in Farris by reason of his having complied with the laws under which the certificate was earned. If this was the purpose of the Legislature the grant can not be regarded as a gratuity or donation to the heirs." Keeping in mind the declaration of the court in Fishback v. Young, supra, that the grant, however issued, if it were to "persons representing, in form or in fact, the deceased, must inure to the benefit of all interested in the estate," we are unable to see why what was said in the Lyne-Sanford case is not as applicable to the facts of this one. In the Act directing the issuance of a patent in this case as in the Act directing the issuance of a certificate in that one, the Legislature recognized as a fact that the decedent before her death had earned the right to the grant. Here, as there, the grant was in recognition of that right. As truly here as there, the consideration that moved the Legislature to make the grant was the right existing in the decedent by reason of her having complied with the laws under which the land was earned. There the certificate was held to have been assets of the decedent's estate, and as such subject to his debts. Here, for similar reasons, we think it must be said that the land was assets of Patsey Lewis' estate and as such subject to be devised by her. The conclusion reached,

we think, is supported by the authorities cited, and we think is very
much strengthened by the decision of the Supreme Court in Nona
Mills Co. v. Wright, 101 Texas, 14. There the Legislature in 1838
had declared certain named persons and "all others who had been
permanently disabled by loss of eye, arm or limb, or other bodily in-
jury," to be entitled to one league of land. One Hamilton, who was en-
titled to a league and labor as one of the persons the Act provided
for, during his lifetime failed, as did Patsey Lewis in this case, to
apply to and obtain from a board of land commissioners a certificate
evidencing his right. January 12, 1854, when he owned no greater
right to it than that owned by Patsey Lewis to the land she devised,
he conveyed to one Dupree in trust for Maria Hamilton, his former
slave, one "league and labor of land donated to him by the State of
Texas for losses suffered during the Mexican invasion." In 1858 the
Legislature passed an Act requiring the Commissioner of the General
Land Office to issue to him a certificate for one league of land, "on
account of wounds received in the service of the late Republic of Texas
in 1836." Hamilton died in 1859. In disposing of the contention
that the deed in trust to Dupree did not pass the title afterwards per-
fected in Hamilton, Justice Brown said:

"The land sued for was located, surveyed, and patented by virtue
of a certificate issued by the Commissioner of the General Land Office
to Isaac D. Hamilton for one league of land by authority of the Act
of February 13, 1858, above quoted. If Isaac D. Hamilton's right was
derived primarily from that Act, then the deed to Dupree did not em-
brace it, because it purported to convey a right in existence at the
time of its execution. If the Act of 1858 stood alone, the grant of the
land to Isaac Hamilton could be derived from it by implication only,
based upon the authority given to the Land Commissioner to issue the
certificate, because there are no words in the law appropriate to express
the grant of a right. The language, 'be and he is hereby required to
issue to Isaac D. Hamilton a certificate,' etc., is apt for directing the
Commissioner to perform a duty in discharge of an existing obligation
of the State; and when we look to the further language, 'for one league
of land on account of wounds received in the service of the late Republic
of Texas in 1836, which have disabled him,' we see that the considera-
tion of the grant is the same as that expressed in the law of 1837.
Looking to the Act of 1837, we find that the grant of one league of
land was made to five persons, by name, 'and all others who have been
permanently disabled by loss of eye, arm or limb, or other bodily injury,
as by certificate of the board of land commissioners, shows his incapacity
for bodily labor, by wounds received in the service of Texas, be and
they are hereby declared to be entitled to one league of land each.'
The Act of 1858 specifies Isaac D. Hamilton as being one of those
who had been wounded in the service of the Republic in 1836, and
whose wounds disabled him. The law creating the land board having
been repealed, Hamilton could not secure his certificate from the Com-
missioner of the General Land Office, because he could not get the
certificate from the board of land commissioners therefor. The Legis-
lature ascertained the facts which the board of land commissioners were
required to find and certify, and then directed the Commissioner of

the General Land Office to issue the certificate for the same quantity of land, for the same service, and based upon the same fact of disability as were specified in the Act of 1837. We think it satisfactorily appears from a comparison of the two Acts taken in connection with the application to the Legislature by Hamilton for relief in 1858 that the right of Hamilton was recognized as existing under the law of 1837, and the Act of 1858 was simply a relief law whereby Hamilton secured the certificate to which he was entitled under the former law. This being the case, we see no reason to doubt the proper construction of the deed to be that Hamilton intended to convey to Maria Hamilton the league of land to which he was entitled under the Act of 1837. There are some discrepancies in the description, but they are immaterial and will be discarded so as to give effect to the intention of Hamilton in making this deed."

If, while at the time he made the conveyance, because of his failure to take advantage of the laws which would have enabled him to have secured a certificate from a board of land commissioners, Hamilton, as must be conceded to be true, did not have a right which the courts could recognize, yet had such a right as through his deed operated to pass to his grantee the title to the land when perfected by the Act of the Legislature, we see no reason why it should be held that the will of Patsey Lewis, made at a time when she had at least as good a right, should not operate to pass to her devisees the title, when perfected, to the land in controversy. We think it must be held that her will did so operate, and that the title to the land in controversy when perfected vested in her devisees. Massey v. Papin, 65 U. S., 362, 16 Law Ed., 734.

Except in so far as it adjudges a recovery of 1280 3-7 acres of the land in favor of appellee W. D. Gordon as against appellant, the Houston Oil Co. of Texas and its receivers, and a recovery of 95 acres of the land in favor of Geo. J. Hassell and others, intervenors, and except in so far as it adjudges costs and a recovery of the sum of $1427.40 in favor of appellee D. L. Gallup as against appellant S. W. Blount, the judgment will be affirmed. In other respects it will be reversed, and judgment will be here rendered that, as against appellant S. W. Blount, appellee D. L. Gallup take nothing, and that appellant the Houston Oil Co. and its receivers recover as against said Gordon and said intervenors said 1280 3-7 and said 95 acres of land. The costs of this appeal will be adjudged against said Gordon and said intervenors, and appellants will have judgment for the costs incurred by them in the court below.

ON MOTION FOR A REHEARING.

The facts as found by the trial court were: 1. That Patsey Lewis left a will dated February 13, 1843, filed in San Augustine County, June 19, 1843, and duly probated, by which she directed that her land on Bear Creek be divided between Burrell J. Lewis, Geo. W. Lewis and A. A. Lewis, except 200 acres, "which shall be first run off for Matilda C. Thompson;" that M. C. Thompson take and raise the testatrix' grandson, Ephraim Talley, and for her trouble in doing so should have

the testatrix' negro woman named Polly; that B. J. Lewis should have her negro woman Sophia, provided he paid testatrix' debts to the amount of $350, or if the debts did not amount to so much, pay the balance of the amount remaining after paying them to Margaret Johnson; that Mary Jones should have testatrix' negro Jane, provided she paid Margaret Johnson $100; that Presha Blankenship should have Sophia's child, and that B. J. Lewis should have testatrix' old field and what land she owned north of the main road from San Augustine to Milam.   2. That Patsey Lewis died about 1843, leaving heirs as named in the finding.   3.   That there was issued to Patsey Lewis on July 23, 1835, by the Mexican authorities a portion of a headright grant, said portion being 4,889,857 square varas.   4.   That on February 1, 1850, the Special Act of the Legislature set out in the opinion of this court was passed.   5.   That on August 3, 1853, a patent was issued by virtue of said Special Act to the heirs of said Patsey Lewis to the land in controversy.   6.   That appellant The Houston Oil Company of Texas had acquired the interest of Geo. W. Lewis and Burrell J. Lewis in said land; that appellee D. L. Gallup had acquired the interest therein of Allison A. Lewis; and that appellee W. D. Gordon had acquired the title of the remaining heirs of Patsey Lewis, except a portion of the Malinda Stovall branch of said heirs, held by the intervenors, appellees Geo. J. Hassell and others.   7.   That the land in controversy is wild, unimproved, timber land, and had never been in the possession of any of the parties to the suit or their privies.   8.   That George Antonio Nixon, commissioner for Zavalla's colony, issued an order of survey authorizing a colonist's headright to be surveyed for Patsey Lewis as the head of a family, and that by virtue thereof there were surveyed two tracts of land in San Augustine County, one for 4,289,857 square varas, which was titled to said Patsey Lewis by said Nixon as commissioner, and the other tract approximately 3321 acres, which was never titled to the said Patsey Lewis.   9.   That said surveys were made and the field notes of the small survey only returned and carried forward into final title prior to November 13, 1835, but that the evidence did not show when or how, if at all, the field notes of the larger tract were returned; that the evidence regarding this did not show anything further than was shown by the affidavit of David Brown, filed in the land office several years afterwards, to the effect that the larger survey had been made in 1835, and by the fact that it was platted on the map of surveys of San Augustine County about 1839.   10.   That there was a small clearing on said large survey made at an early day, but that the evidence did not show by whom it was made, nor for what purpose, nor when.   11.   That Geo. W. Lewis, one of the devisees named in Patsey Lewis' will, on Nov. 4, 1853, conveyed his interest in the land to B. J. Lewis, another of said devisees; and that no conveyance seemed ever to have been made by any one of the 200 acres set aside in said will to Matilda Thompson.   12.   That on June 4, 1858, Burrell J. Lewis, by warranty deed, conveyed to R. Waterhouse a recited undivided two-thirds interest in said land, except 200 acres.   13.   That appellant, the Houston Oil Company of Texas, and its receivers had acquired all the title owned by Burrell J. Lewis to the land by will, deed or inheritance.   14.   That there were assessments

made on the land as follows: 3321 acres assessed to B. J. Lewis for the years 1847 and 1848; 2221 acres assessed to him for 1849; 2214 acres for 1850; 2510 acres for 1851, 2285 acres for 1852 and 1853; and 3543 acres in 1854; that the interest of B. J. Lewis in said land (acres not given) was assessed to R. Waterhouse in 1856 and 1857, and 1180 acres for the years 1858, 1859 and 1860; that 2360 acres was assessed to said Waterhouse for the years 1861, 1862, 1863 and 1864, and to his estate for 1865, 1866 and 1867; 3000 acres for 1868, 1869, 1870 and 1871; and 1800 acres for 1872; and that since 1872 a two-thirds interest in the land was assessed to parties claiming under the Waterhouse estate,—but that there was no evidence showing who, if any one, paid taxes on the land at any time. 15. That there was no evidence of a claim of ownership to the land by any of the heirs of Patsey Lewis or by any one holding under them, other than that portions thereof were assessed to some of them and that portions thereof were conveyed by deeds and other muniments of title at various times. 16. That a tract of land practically in the same shape as the land in controversy and apparently covering the same or approximately the same territory, was delineated on plats or maps of San Augustine County surveys on file in the General Land Office, and dated November 10, 1839, and .... day of .... 1841. 17. That the property willed to the devisees of Patsey Lewis as stated in her will was not shown not to have been received by them, from which fact the court inferred that they did receive such devise. 18. That Patsey Lewis in her lifetime conveyed to some of her children, by deeds reciting various considerations, portions of her titled survey of land in San Augustine County, being the smaller of the two tracts mentioned. 19. That the evidence did not show what property Patsey Lewis owned or claimed during her lifetime, other than as before stated in the findings, nor did it appear that she had distributed same among her heirs nor that they accepted the same other than as before found, nor that intervenors, or those under whom they claimed, had received more in said distribution than they were equitably entitled to, nor that the devisees in her will received less of her estate than they were equitably entitled to upon the basis of the land in controversy being accounted no part of her estate.

Among other things, the trial court refused to find as requested by appellants: 1. That a survey of the land in controversy was made and field notes thereof returned to the General Land Office prior to November 13, 1835. 2. That Patsey Lewis took possession of the land, had a small field cleared on the land and claimed it during her lifetime, and that same after her death was inventoried by her administrator as a part of her estate. 3. That Patsey Lewis by her deeds to certain of her children and by the bequests in her will disposed of all the property of which she was possessed and distributed and partitioned same among her children. 4. That the intention of the Legislature as shown by the Act which authorized and required the Commissioner of the General Land Office to issue a patent to the heirs of Patsey Lewis and other facts and circumstances in evidence was to recognize the right of Patsey Lewis to said land and to confirm her right to the particular tract which she had caused to be surveyed un-

der and by virtue of the order of the commissioner of Zavalla's colony. 5. That the heirs of Patsey Lewis under whom the intervenors and W. S. Gordon claim and deraign their title, having accepted property devised to them by the will and conveyed to them by deeds of gift, all parties claiming under them were estopped from claiming title to the land or any part of same involved in this suit.

Appellants excepted to the court's findings of fact, to the judgment based on same, and to the refusal of the court to find certain facts as requested by them, among such facts so requested to be found being those just specified. By proper assignments of error the action of the court in connection with the matters covered by the exceptions were brought to this court for review. On an examination of the record, we concluded that the findings of the trial court, except in one or two particulars, were supported by the record, and further concluded that in one or two other particulars, findings which should have been made had not been made. The findings which we did not think were supported by the record were: 1. That the evidence did not show that field notes of the land in controversy were returned to the land office. 2. That the land had never been in the possession of any of the parties to the suit or their privies. The findings which we concluded should have been but were not made were: 1. That the land in controversy had been surveyed in 1834 and 1835 for Mrs. Lewis by David Brown, and that field notes thereof had been returned to the land office. 2. That during her lifetime she had taken possession of and claimed the land, and that same was inventoried as a part of her estate after her death. 3. That the intention of the Legislature as shown by the evidence was not to make a gift of the land to Mrs. Lewis' heirs but was to recognize and confirm in Patsey Lewis a right to same.

In motions for a rehearing appellees complain of the failure to specify in the opinion disposing of the appeal the particulars in which we found that the trial judge's conclusions of fact were not supported by the record and the particulars wherein he should have made and did not make findings. It is out of respect to this complaint of counsel that the foregoing statement has been extended to such length as it possesses.

The correctness of the conclusion reached by us that the land in controversy had been surveyed for Mrs. Lewis by David Brown on October 13, 1834, and that field notes thereof had been returned to the land office, is challenged in the motions for a rehearing. The evidence which we thought required such a finding was: 1. The affidavit of David Brown found among the papers relating to the land in the General Land Office, to the effect that he had made a survey of twenty labors previous to May 1, 1835, and previous to the closing of the land office in that year. This affidavit, being found among papers relating to it, we think should be held to have reference to the land in controversy. 2. The recital in the petition to the Legislature for the relief Act that Patsey Lewis had had the land in controversy surveyed by David Brown in the spring of 1835. 3. The testimony of J. T. Robison, chief clerk in the General Land Office, in answer to interroga-

tories propounded to him in this suit. Said testimony so far as it bears on the matter in question is set out below:

## "Int. 9.

"Q. Please attach to your answer to this interrogatory a certified copy of the field notes of a survey of twenty labors of land made by David Brown for Mrs. Patsey Lewis in 1834 by virtue of an order issued by Geo. Antonio Nixon, Commissioner for Zavalla's Colony.

"A. I hereto attach a certified copy of the field notes of a survey made by David Brown for Mrs. Patsey Lewis October 13, 1834, in San Augustine County, and have marked the same Exhibit "C" for identification. These are the only field notes in the General Land Office made by David Brown for Mrs. Patsey Lewis in the year 1834.

## "Int. 10.

"Q. Have you attached the certified copy of said field notes called for and described in the preceding interrogatory, and if you have not, why not?

"A. Answered in my answer to interrogatory No. 9 to which I refer.

## "Int. 11.

"Q. If you have stated that the field notes called for and described in the 9th Inty. are not on file in the General Land Office, please make a careful and thorough search in your office for the said field notes.

"A. I have not stated that the field notes called for and described in the 9th interrogatory are not on file in the General Land Office. Exhibit "C" hereto attached, is a certified copy of the only field notes that can be found in the General Land Office made by David Brown for Mrs. Patsey Lewis in the year 1834. The records show that a Spanish title was issued to Patsey Lewis July 23, 1835, for 4,889,857 square varas by Arthur Henrie, surveyor, situated in San Augustine County and the field notes of said land are embraced in said title. Diligent search has been made but no other field notes can be found.

## "Int. 12.

"Q. Have you made the search for the field notes as requested in the 11th interrogatory, and if so, what is the result of your search? Please give the character and extent of the search made by you for the said field notes?

"A. I have made the search requested in the 11th interrogatory but can find no other field notes made by David Brown except those heretofore referred to, a certified copy of which has been attached marked Exhibit "C." All of the records where such papers could be kept have been examined as well as the vaults where the Spanish archives are kept."

The field notes referred to as attached and made a part of the witness' answers were not made a part of the record on this appeal. The answers of the witness Robison to the 9th, 10th, 11th and 12th interrogatories, in the absence of the copy of the field notes made a part thereof, fairly could be referred only to the larger survey—the one

in controversy. The witness was asked about field notes of a survey of twenty labors made by David Brown in 1834. He answers that he attaches a copy of field notes of a survey made by David Brown Oct. 13, 1834. He is then asked if he has stated that field notes of the twenty labors survey so made are not on file in the General Land Office to make a careful search for same. To this he replied that he had not stated that such field notes were not on file in the Land Office. He had and would have no doubt that the testimony referred to field notes of the land in controversy but for the answer of the witness to the second cross-interrogatory, as follows:

### "Cross Int. 2.

"Q. In what part of the Archives do you find the ex parte affidavits of D. Brown? and the other instruments you have copied?

"A. The affidavit and order of survey, certified copies of which are hereto attached, marked Exhibit A and B, are on file in the General Land Office with File No. 55, San Augustine 1st class, which contains the field notes of a survey made by H. Bates surveyor of San Augustine County, October 5, 1852, for Patsey Lewis of one sitio of land in Zavala's colony, pursuant to an order of survey George Antonio Nixon dated San Augustine, September 25, 1834. The originals of these papers were not found in the vaults where the Spanish archives are kept, but there is nothing on the affidavit of David Brown to indicate that it was regularly filed with File No. 55 San Augustine 1st class except a pencil notation of the file number, district and class. The order of survey is endorsed 'File No. 55 San Augustine 1st class 20 labors Patsey Lewis,' thus indicating that field notes must have been at one time on file attached to said order of survey, but they are not now with said file, or attached to said document and nothing to show what became of them. They are not in the General Land Office as far as I am able to find. The field notes a certified copy of which has already been attached and marked Exhibit C were found in the vault where the Spanish archives are kept in the book of English field notes, labelled DP3, page 14½."

The latter part of the answer seems to be inconsistent with the answers to direct interrogatories quoted, and to indicate that the witness may have had reference to field notes of some other survey. Appellee insists that the witness referred to field notes of the small survey titled to Mrs. Lewis, and calls our attention to the fact that in their brief appellants concede that the "exhibit C" the witness referred to was a copy of field notes of the small survey. The field notes the witness had reference to evidently were of a survey made October 13, 1834, by surveyor Brown. The field notes of the small survey as copied into and forming a part of the final title appear to have been made July 23, 1835, by surveyor Henrie. But conceding that the witness had reference to field notes of the smaller survey when he testified they were in the Land Office, while the correctness of the conclusion reached by us that the land in controversy was surveyed by Brown *Oct. 13, 1834* and that the field notes of the survey so made *are* on file in the Land Office, might for that reason well be questioned, yet the material part of that conclusion—to wit, that

a survey *had* been made and field notes thereof *had* been returned to the Land Office of the land in controversy during Patsey Lewis' lifetime, would be left unshaken.

The conclusion reached by us that the record showed that a portion of the land during her lifetime at the instance of Patsey Lewis had been cleared, is vigorously attacked. The conclusion was based on the testimony, undisputed, of the witness B. J. Lewis, a son of Geo. W. Lewis, deceased, and a grandson of Patsey Lewis, deceased. The witness was born in 1852. He testified—we copy from the stenographic report—as follows:

"Q. Can you state from family tradition or from your own knowledge, what you heard, whether said land was ever actually occupied or possessed by Patsey Lewis or whether she had anyone in actual possession?

"A. I heard papa say that his mother sent him some negroes down there at a little place, I think it was a place down there where widow Raines is; a few settlements of land cleared.

"Q. Do you know of your own knowledge whether it was an old clearing down there?

"A. There was an old field there as far back as I can remember—small field, 10 or 15 acres."

This testimony, it seems to us, in connection with the fact that in her will Patsey Lewis referred to it as her land, and to the fact that at her death it was inventoried as a part of her estate, justified and made proper the conclusion reached that during her lifetime Patsey Lewis had taken possession of the land.

The other finding made by us, to wit, that the intention of the Legislature as shown by the evidence was to recognize and confirm in Patsey Lewis a right to the land, and not to donate same to her heirs, is also vigorously assailed. According to the view taken by us this intent was the controlling question in the case. It received our careful consideration in connection with the authorities relied upon by appellees as support for their contention that the Act of the Legislature should be construed as a donation to the heirs. In the consideration of the motions for a rehearing we have again carefully examined those of the cases relied upon as conclusively establishing their contention. McKinney v. Brown, 51 Texas, 96, seems to be the one most confidently urged as directly in point. There, on February 1, 1838, a board of land commissioners had issued to Brown as a colonist a certificate numbered 238 for one league and labor of land. On February 27, 1838, by an endorsement thereon Brown transferred the certificate to one Bell. The certificate was never recommended by the commissioners appointed under the laws of the Republic to detect fraudulent land certificates, nor was suit ever brought to establish same as permitted by the Constitution of 1845. By a Special Act of the Legislature passed September 1, 1856, the Commissioner of the General Land Office was ordered to issue to the heirs of Brown a certificate for one league and labor in lieu of his headright certificate No. 238. The certificate authorized by the Special Act was located and the land so located was patented to Brown's heirs September 7, 1860. The suit was by the heirs of Bell to prove up as against the heirs of Brown the assign-

ment to Bell and to recover the land. The Supreme Court held: 1. That the unrecommended certificate issued to Brown by express provisions of the Constitution of 1845 was absolutely null and void. 2. That being void neither Brown, to whom it was issued nor Bell, to whom it had been assigned, acquired thereby a legal right as against the government, which either a court of law or equity could recognize and enforce. 3. That therefore the subsequent Special Act of the Legislature directing the issuance of a certificate to Brown's heirs was but an act of sovereign grace and bounty on the part of the political authority. 4. That being a mere gratuity the State had a right to designate to whom the same should be given. The decision of the court (in the McKinney-Brown case) was based upon the provision in Section 2 of Article 11 of the Constitution of 1845, declaring that the courts should be open until July 1, 1847, for the establishment of certificates for headrights not recommended by the commissioners appointed to detect fraudulent land certificates, and further declaring that all such unrecommended certificates as should not be established or sued upon before the date mentioned should be barred, and that all such certificates not so established and all locations and surveys made by virtue thereof should be forever null and void. Section 10 of the General Provisions of the Constitution of the Republic had declared that "all orders of survey legally obtained by any citizen of the Republic, from any legally authorized commissioner, prior to the act of the late Consultation closing the land offices, shall be valid." (And see Sec. 20, Art. 7 of the same Constitution.) The provision of the Constitution of 1845 referred to did not in express terms make void orders of survey declared by the Constitution of the Republic to be valid. By its express terms it made void only such certificates and surveys made by virtue thereof as had not been recommended as genuine by the traveling board of land commissioners and as had not been established by suit within the time allowed. The provision in the Constitution of 1845 which controlled in the McKinney-Brown case had and has no application to the facts of this case. Patsey Lewis had not obtained from a board of land commissioners a land certificate which either had or had not been recommended by the traveling board. Such claim as she may have had on the land in controversy here was not by the provision in the constitution of 1845 declared to be void. In passing on her claim a court would not have been required either to ignore the declaration of the Constitution or to have denounced it as absolutely void—and because absolutely void, not capable of being made the foundation of a right, as it was necessary for the court to do in the McKinney-Brown case. Having legally obtained an order authorizing a survey of the land, declared by the Constitution of the Republic to be valid, Patsey Lewis had acquired a right never thereafterwards and before the passage of the Special Act for the relief of her heirs, declared to be void. We have not said—in fact, in the opinion disposing of the appeal we have said to the contrary—that her right had been so perfected as to make it either a legal or an equitable one, in the sense that a court would be bound to recognize and protect it. She had not, as the laws in force required she should have done, gone before a board of land commissioners and had issued to

her a certificate for the quantity of land she was entitled to. Because she had not and her legal representatives had not procured the issuance of a certificate, and because the law creating boards of land commissioners was no longer in force at the time the Special Act was passed, her heirs were, as Hamilton was in Nona Mills Co. v. Wright, 101 Texas, 14, without legal remedy. If her right to the land depended alone upon the facts preceding the issuance of the Special Act certificate, we would feel bound to hold on the authority of Land Comr. v. Reily, Dall., 381; Jones v. Menard, 1 Texas, 771; Jones v. Borden, 5 Texas, 409; Land Comr. v. Raguet, 2 Texas, 98; and Paschal v. Perez, 7 Texas, 370, cited by appellees, that her claim was not one a court could recognize and enforce on principles of either law or equity. Her right was not one of which the courts could take cognizance, but it was one which had been expressly recognized by the Republic as existing in her, one which had never by any Constitution or law of the State to which we have been cited been declared to be void, and one which the political power had a right and the power to recognize and confirm. Another point of difference between the McKinney-Brown case and this one lies in the fact that the only evidence furnished by the record of that case of the intention of the Legislature to recognize in Brown a right to the certificate was the recital in the Special Act that the certificate was to be issued in lieu of the one declared by the court to be void. Such a recital is not inconsistent with an inference that the Legislature did not thereby mean to recognize and confirm a right declared by the Constitution to have been without foundation and void. It was consistent with an inference that the Legislature, as determined by the court, did not thereby mean to so recognize and confirm such a right, but, instead, intended the grant to be purely and simply a donation. The conclusion reached in that case, we think, was demanded by its facts. Here the facts are materially different. By a valid order of survey Patsey Lewis in her lifetime had had the land in controversy surveyed —segregated from the public domain, not in the sense that by such segregation it had been lawfully appropriated so as to defeat rights others might lawfully acquire thereto—but in the sense that it was separated from other land, and so identified as the land she claimed; she had during her lifetime asserted rights of ownership over it, if not by having it cleared and fenced, by undertaking by her will to dispose of it; after her death it had been inventoried as a part of her estate; had been assessed for taxes as land segregated from the public domain and therefore subject to taxation; signing himself as her "administrator and representative," Thompson, further describing himself as "representative" of her heirs, had made application to the Legislature for the issuance of a patent to the land, "in as much," he recited, "as the Constitution of the Republic guarantees to all settlers or colonists of the Republic of Texas a right to their headrights or parts of their headrights which was surveyed previous to the closing of the land offices by the Consultation," and had assigned as reasons why a relief Act should be passed, that Patsey Lewis during her lifetime, in about the year 1834 or 1835, had obtained an

order authorizing a survey of the land, had had it surveyed by David Brown in the spring of 1835, as evidenced by a copy of field notes, recited to be attached to his petition, and that the land had always appeared as hers upon the map of San Augustine County; and, lastly, the relief Act of the Legislature directed that the specific land be patented—it "being," the Act recites, "the residue of a league to which said Patsey Lewis in her lifetime was entitled." So, it appeared here, as it did not in the McKinney-Brown case, that Patsey Lewis during her lifetime in fact had acquired an equitable right—not enforcible, indeed, by the courts, but yet a right—that it was this right that the Legislature was petitioned to recognize and confirm—and that it was this right it did recognize and confirm.

Leonard v. Rives, 33 S. W., 292, a case relied upon as most in point next to the McKinney-Brown case, we think is clearly distinguishable from the case before us. So far as the report of the case shows, there was nothing in the record suggesting that the certificate directed by the Legislature to be issued to the heirs and wife of Walter H. Gilbert was in recognition and confirmation of any right ever existing in Gilbert. On the face of the record in that case, the certificate was, as held by the court, a donation.

The other cases relied upon by appellees are, we think, as clearly distinguishable from this one. (See Fields v. Burnett, 108 S. W., 1048.)

We did not think and do not now think the law of forced heirship in force from 1840 to 1856 (1 Sayles' Early Laws, p. 400) should be held to affect the question presented by this appeal. The record showed deeds of gift by Patsey Lewis to those of her children not provided for in the will. What the value of those gifts with reference to the value of the land in controversy may have been, the record does not show. If the gifts were advancements from her estate and equal to the portion the donees as forced heirs were entitled to, the will would not have been in contravention of the law. Parker v. Parker, 10 Texas, 83. The record showing facts which more or less strongly indicate that the will may not have been void because in contravention of the law of forced heirship, we do not think it should be assumed that it was void, and give weight to such assumption in looking to the intent of the Legislature in passing the Special Act in question.

While, as we understand the law controlling the case, the conclusion reached by us was a correct one and is adhered to, appellees' complaint that the judgment rendered here, based on that conclusion, is erroneous, is a just one. The fact that appellants, The Houston Oil Company and its receivers, did not have pleadings in the case justifying affirmative relief in their favor, was overlooked, as was also the fact that appellee Gordon owned a small undivided interest in the 200 acres devised to Matilda C. Thompson. The judgment rendered here will be so corrected as to decree to appellee Gordon and the interveners a four-sevenths undivided interest in the 200 acres devised to Matilda C. Thompson, and to appellee David Gallup an undivided one-third interest, or 956 acres, in the entire survey, less 200 acres thereof, as against the Oil Company and its receivers. The costs incurred by appellee Gallup in the court below and in this court

on the issue of title to the land will be adjudged against said Oil Company and its receivers. The costs incurred in the court below by appellee Gordon and the interveners will be adjudged against the Oil Company and its receivers, and the costs incurred by the latter on this appeal will be adjudged against said Gordon and said interveners. The judgment further will be in favor of appellant Blount that appellee Gallup take nothing as against him and that said appellant Blount recover of appellee Gallup the costs incurred by him in this court and in the court below.

Appellee Gallup insists that we erred in reversing the judgment in his favor against appellant Blount for the sum of $1427.40, and in decreeing that he take nothing as against said Blount. The contention is that error was not assigned in the court below to this part of the judgment there rendered, and that there has not been presented to this court an assignment complaining of the judgment in this particular. The record shows that appellant Blount duly excepted to the judgment of the court at the time it was rendered, gave notice of and perfected an appeal to this court, and assigned as errors the action of the court on the matters involving the question as to the title to the land. It does not show that he assigned as error in the court below or in this court the action of the court in rendering judgment in favor of appellee Gallup against him on his covenant warranting the title to the land. His assignments of error go, not specifically to the recovery itself, but to the basis for the recovery against him. After reaching the conclusion on assignments of error properly presented that the basis for a recovery against him did not exist, it would, it seems to us, be unreasonable to hold that, the basis for it gone, the judgment against him nevertheless must stand. In the absence of any assignment of error on his part, having reached the conclusion that the record showed no cause of action against him in appellee Gallup's favor, we think the error so appearing should be treated as fundamental, and as devolving the duty on this court of correcting it.

The motions for a rehearing are overruled.

*Reversed and rendered.*

Writ of error refused.